Joseph H. Lackey and Dora A. Lackey, Appellants,
v. First National Bank of Oblong et al., Appellees.

Opinion filed March 1, 1941.

CLYDE L. TODD, of Chicago, and ROY E. BOLEY, of Olney, for appellants.

VALMORE PARKER and CARROLL T. COX, both of Robinson, for appellees.

MR. JUSTICE DADY delivered the opinion of the court.

Plaintiffs, Joseph H. Lackey and Dora A. Lackey, his wife, brought this suit on October 15, 1938, to have their deed executed August 12, 1935, conveying certain land to defendant First National Bank of Oblong, hereafter referred to as "defendant bank," declared a mortgage, and for leave to redeem therefrom and to have cancelled certain subsequent conveyances and transfers of the land. All defendants answered, denying the deed was a mortgage and claiming it was given in part payment of a debt due defendant bank and Oblong Motor Company. The defendants who acquired

interests in the land under the subsequent transfers also alleged that they were purchasers for value, in good faith and without notice of any claim of plaintiffs. On a hearing before the court the suit was dismissed for want of equity. Plaintiffs prosecute this appeal from such decree.

In May, 1932, plaintiffs owned the premises in question consisting of 240 acres of land located in Richland county, Illinois, and also owned and resided on 230 acres in Crawford county. The Richland county land was vacant and unimproved, and with the exception of 35 acres which had been cleared, was timber land.

On May 20, 1932, plaintiffs executed and delivered to defendant bank 2 judgment notes totaling $5,637. One note was for $4,895 and represented a renewal of 4 notes aggregating a like sum evidencing money borrowed from defendant bank over a period of years. The other note was for $742, was guarantied by defendant motor company, and was a renewal of plaintiffs' note to such motor company previously discounted at the bank. These 2 notes matured on May 20, 1934, and were both secured by 2 mortgages to the defendant bank dated May 20, 1932, and executed by plaintiffs. One mortgage covered 160 acres of the Richland county land, and the other covered the Crawford county land.

It is undisputed that after the 2 notes matured the defendant bank threatened to confess judgment on said notes and to levy on plaintiffs' property, and insisted that plaintiffs sell some of their land or the timber thereon to pay the debt due the bank; that the defendant bank repeatedly demanded that such notes be paid; that throughout 1934 and part of 1935, at the insistence of the defendant bank, the plaintiffs, aided by Mr. O'Dell, who was president of the bank and Mr. Newlin who was manager of the motor company, endeavored to find buyers for the timber in an effort to raise money to apply toward the payment of the notes; and that all such efforts to raise money proved unsuccessful.

On June 10, 1933, plaintiff, Mr. Lackey, applied to the Federal Land Bank of St. Louis, hereafter referred to as "land bank," for a loan of $4,000 on the Crawford county land. Such application was on a printed form signed by Mr. Lackey and stated that Lackey's purpose in getting the loan was "to pay debts incurred prior to June 1, 1933,—$5800" that the applicant owed the defendant bank an indebtedness of $5,600 incurred in May, 1932, due in 1934, and that Mr. Lackey authorized the land bank to pay out of the proceeds of the loan applied for such debt due defendant bank.

In November, 1933, the land bank on such application approved the making of a loan to plaintiffs for $2,500, but this loan was not accepted by plaintiffs. Thereafter and on March 19, 1935, a new commitment for a loan of $3,000 on such application was made by the land bank, subject to certain requirements, one being that all debts of the plaintiffs had to be paid from the proceeds of the loan. An appraiser for the land bank testified that he appraised the Crawford county land in 1935; that the land bank did not make loans on unimproved lands; that Lackey told him his debts were about $5,700; and that he advised Lackey that the land bank would not grant a loan unless all of Lackey's debts were paid, and that it would be necessary to raise the balance of the debt by the sale of the Richland county land. Lackey testified that he did not know such appraiser and had never talked with him on this subject matter.

On June 18, 1935, the motor company paid the defendant bank the amount represented by the $742 note and took up such note and the motor company held such note on August 12, 1935.

The deed sought to be set aside was signed by plaintiffs in the defendant bank on August 12, 1935. There were then present the two plaintiffs, O'Dell as president of such bank, McKnight who was cashier of such bank and Newlin as manager of the motor company.

There is a conflict in the testimony as to what was said and done by the respective parties shortly before and at the time of executing such deed.

Lackey testified that on August 11, 1935, with his son, Perry, he talked with O'Dell at the defendant bank; that O'Dell asked him to pay the money due the bank and became very angry and told Lackey that he was not going to wait any longer and that Lackey and his wife would have to come in the next day and make O'Dell a deed to the land. Perry, the son, testified that on August 11, 1935, O'Dell told his father it was time for Lackey to give them some security on the note; that Mr. Lackey asked O'Dell what he wanted and O'Dell said he wanted a deed to the Richland county land; that Mr. Lackey said he didn't want to do that and O'Dell said if it wasn't settled in 24 hours he was going to take legal action. In his testimony O'Dell did not deny or refer to such alleged conversation of August 11th.

Mr. Lackey testified that on August 12, 1935, he and Mrs. Lackey first talked with O'Dell at the bank in the forenoon, that he told O'Dell he did not like deeding the land to the bank because it was worth more money; that O'Dell told them they had to do it; that he told O'Dell he would give him a deed to the 160 acres covered by the mortgage, but O'Dell said Lackey had to put it all in, that O'Dell did some figuring and said "If I would give him $300 in money and this deed he would let me go"; that O'Dell said he would allow Lackey $2400 for the land; that he and Mrs. Lackey then went to the office of the motor company where they talked with Newlin; that Newlin and Mr. Lackey then drove to Robinson, Illinois, where Lackey obtained a draft for $300 from another bank; that Mr. and Mrs. Lackey thereafter in the afternoon went to the defendant bank and O'Dell called Newlin who then came to such bank and the deed was then executed. Lackey further testified that Newlin had told him that

the defendant bank had required the motor company to take up and the motor company had taken up the $742 note, but that at the time of signing the deed he believed he owed the bank $5,637, and would not have signed the deed if he had known he did not owe the bank that much. Mr. Lackey further testified that ''I made arrangements with him (O'Dell) that if I could ever redeem it within a certain time he would let me have it back, he said he would.''

Mrs. Lackey testified that on August 12th in the forenoon O'Dell told her and her husband ''We had to get the money, that we had been carried long enough,'' that she told O'Dell she wasn't going to sign the deed for the 240 acres, that O'Dell said they would have to have a deed for the 240 acres because they could not get more than $10 an acre for it; that O'Dell said that if the Lackeys did not sign the deed ''he would break us up and take everything we had.'' She further testified that in the afternoon when the deed was executed Mr. Lackey said ''if he would ever get to where he could redeem the land, if Mr. O'Dell would let him have it back,'' and that O'Dell said ''he would rather have the money than the land,'' and Mr. Lackey said ''We would sign a deed if it was understood we would get the land back.'' She further testified that at the time of executing the deed she believed their indebtedness to the bank to be $5,637 and did not know the motor company had taken up the $742 note. She further testified that O'Dell told them he would turn the land back to them if they ever got the money to pay the bank, but that he did not say how long he would hold the land. She further testified that the plaintiffs had never tendered the money to the bank and that she had not said anything about it to the bank.

O'Dell testified that ''We told Lackey that if he would pay us $300 in cash and convey to us 240 acres of the land in Richland County we would sign the

agreement with the Federal Land Bank to accept their loan as full payment on the debt to us." The date of this conversation is not given. O'Dell further testified that he did not remember plaintiffs being in the bank in the forenoon of August 12th, but that in the afternoon of such date the plaintiffs came to the bank and Mr. Lackey then said he was ready to close up the deal on the proposition O'Dell had made him; that the deed was then drafted and executed by the plaintiffs and Mr. Lackey gave Mr. O'Dell the draft for $300; that Mr. Lackey then asked for and was given a receipt, which receipt is hereafter more particularly referred to. O'Dell further testified that nothing whatever was said about any agreement to reconvey the land to the plaintiffs and that no protest was made by either plaintiff. McKnight testified that he was present when the deed was executed and nothing was said about any agreement to deed the land back to the plaintiffs.

Newlin testified that on August 12th Mr. Lackey came to the motor company office about 10 a. m. and told Newlin he had come in to straighten up with the bank and to notify Newlin so that Newlin could get in on the deal; that later in the afternoon he was present when the deed was executed; that "we agreed, the bank and I together," to take the proceeds from the land bank loan and $300 in cash in payment of the debt due the defendant bank and the motor company; that nothing was said about deeding the land back to the plaintiffs. He further testified that after the deed was executed he told the plaintiffs he wanted the money and not the land; that he may have told them he would turn the land back to them if they got the money, that he might have made such statement because he would rather have the money than the land.

At the time such deed was executed there was given to plaintiffs at their request the following receipt

signed by O'Dell in behalf of the defendant bank and by Newlin in behalf of the motor company: "Received Twenty-seven hundred no/100 Dollars, $2700.00 by deed to 240 acres land in Richland Co. Ill. and cash as part payment on note of $5637.00 dated May 20, 1932. This payment to be applied $2700.00 on principal $ none on interest. Last bal. due on principal $5637.00. This payment $2700.00. Bal. now left on principal $2937.00." After the signatures of O'Dell and Newlin this further statement appeared on the receipt: "We agree to accept $2876.00 as payment of the balance of this debt if paid within six months."

No indorsement of the credit of $2,400 for the land so deeded was ever made on the notes. The $300 cash payment was applied and credited $260.55 on the $4,895 note and 39.45 on the $742 note.

About 10 days after the deed was signed the defendant bank at the request of the land bank executed an agreement to accept the land bank loan in full payment of the balance due on both notes.

After August 12, 1935, the bank continued to hold the two mortgages and the $4,895 note, and the motor company continued to hold the $742 note, until January 21, 1936, when the land bank loan was completed, at which time the 2 mortgages and the 2 notes were turned over to the land bank and defendant bank then received from the land bank $2,854.53 of said land bank loan. Of this $2,854.53 the sum of $2,497.56 was retained by defendant bank and the balance of $356.97 was paid by the defendant bank to the motor company.

On September 10, 1935, defendant bank conveyed to the Egyptian Tie and Lumber Company all standing timber on the land in question for $1,000 and retained $868.40 thereof and paid the balance of $131.60 to the motor company.

On November 16, 1936, the defendant bank conveyed 200 acres of the land in question to the defendant Dees

subject to the rights of the Egyptian Tie and Lumber Company and received therefor the sum of $2,084.40. On November 16, 1936, the defendant bank conveyed the remaining 40 acres of the land in question to the motor company as its share of the land in connection with the settlement made with the plaintiff, subject, however, to the rights of the Egyptian Tie and Lumber Company. By these transactions the defendant bank received a total of $5,710.91 on its said principal note of $4,895 and the motor company received $528.02 and 40 acres of land, subject to timber rights, on its principal note of $742.

After Dees had contracted to buy such land and shortly prior to the execution of such deed by the defendant bank to Dees, the defendant bank at the request of Dees and on November 3, 1936, released the said mortgage on such 240 acres.

After November 16, 1936, Dees and his wife executed certain oil and gas leases to the defendant Mattox, and other conveyances and transfers were made, all of which conveyances and transfers we do not deem material to set forth.

Mr. Lackey testified that the value of the timber in 1935 was $4,000. One of his witnesses testified that the timber in his opinion was then worth around $2,500, that he did not know what the land was worth exclusive of the timber, "there was no demand for that." Another witness for the plaintiffs testified that in 1935 the timber was worth $2,000 exclusive of the land and that the land without the timber was worth $10 per acre. A witness for the defendants testified he valued the timber at $1,000 and an appraiser for the land bank valued the land at $5 per acre. Another witness for the defendants valued the timber at $1,000.

After the sale of the timber, both plaintiffs learned of such sale but neither of them made any protest, and neither of them asked for a reconveyance prior to the commencement of this suit.

The question presented is whether the conclusion of the trial court that the deed in question was absolute and not a mortgage is warranted by the evidence.

It is well settled that in a court of equity it is competent to show by parol that an instrument purporting to be an absolute conveyance of real estate is in fact but a mortgage. The question is one of intention to be ascertained from all the circumstances in evidence. (*Workman v. Greening,* 115 Ill. 477.) The rule is that where land is conveyed in fee by a deed absolute and there is no condition of defeasance in the deed or in a collateral paper and parol evidence is resorted to as in this case for the purpose of establishing that the deed was given as a mortgage, such evidence must be clear and convincing, otherwise the presumption that the deed is what it purports to be on its face must prevail. (*Keithley v. Wood,* 151 Ill. 566.) If in such cases the parol evidence leaves in doubt the character of the deed as a mortgage, the doubt must be resolved in favor of the absolute character of the deed. Had there been a condition of defeasance in a collateral paper or writing, any doubt whether the transaction is a mortgage would be resolved in favor of its character as a mortgage. These rules are well established in Illinois. (*Illinois Trust Co. of Paris v. Bibo,* 328 Ill. 252.)

In our opinion, the plaintiffs failed to show that the deed to the bank was ever intended as, or was in fact understood to be, a mortgage. The deed was an absolute conveyance and contained no condition of defeasance. Other than the deed, the only writing executed at the time of the conveyance was a written receipt which in substance stated that the defendant bank had received and was giving credit for $2,700 on the indebtedness of the plaintiffs by way of the deed and $300 in cash. Lackey was aged about 74 and had been a farmer all his life, but it is not shown that he was under any disability. Mrs. Lackey's age is not given, but the record shows she had taught school be-

fore she was married. Both plaintiffs testified that Mrs. Lackey asked for and was given a receipt. The plaintiffs kept this receipt for over 3 years before commencing any suit, and in the meantime made no complaint or protest to any of the defendants, and prior to the commencement of this suit did not ask for any reconveyance. If at the time of the delivery of the deed the plaintiffs understood they had the right to redeem, it seems reasonable that when they asked for and received the receipt in question they would have asked that said alleged agreement be inserted in such receipt or in a separate writing.

There can be no doubt but that at the time of the making of such conveyance all of the parties understood that the defendant bank and the motor company were to accept in full payment of all the moneys due them whatever amount they might later realize from the loan by the land bank. The defendant bank and the motor company carried out this understanding by the defendant bank signing an acceptance with the land bank and by later accepting such money from the land bank. When the land bank did disburse such loan the defendant bank and the motor company were paid the balance of $2,937 due them, not including interest which had accrued after August 12, 1935, by being paid $2,854.53, at which time the defendant bank and motor company surrendered to the land bank the two mortgages and the two notes in question.

We cannot say the consideration paid was inadequate. In our opinion it was not so inadequate as to tend to show the transaction was intended as a mortgage. Land was not selling freely. One witness for plaintiff would not place a value on the land, stating that there was no demand for such land. Opinions as to its value differed and there is no evidence of fraud or unconscionable conduct.

Plaintiffs urge that defendant bank, taking advantage of its position as a creditor, unfairly coerced plaintiffs into executing the deed against their will.

The evidence does not support this contention. The plan proposed by O'Dell for the liquidation of the debt, which plan was ultimately carried out, was submitted before the deed was signed, and only after other methods of raising money had been tried and failed. Plaintiffs had ample time to consider the offer and seek independent advice if deemed necessary. No fiduciary relationship existed between the parties and all of them had equal opportunity to know the facts. We find that no misrepresentation, fraud or deception was practiced on the plaintiffs to induce them to sign. It may be assumed that during the negotiations the defendant bank threatened to enforce its rights under the notes unless the debt was settled or paid. Such fact in itself will not constitute duress. (*Stone's Beauty Shops, Inc. v. Morrison Service Ass'n,* 285 Ill. App. 163.) The mere statement of plaintiffs that they were acting under duress in the light of other testimony in the record was not sufficient evidence of such fact. (*Hagan v. Waldo,* 168 Ill. 646.)

The point is made that the failure of the defendant bank to credit the $2,400 on the note in the same way it credited the $300 cash payment on the note indicates an intent not to treat the land as part-payment. That such a credit was intended and given is fully established by the written receipt given the plaintiffs at the time the deed was signed, which acknowledged such credit and showed the balance due, and the failure to indorse such credit on the notes we consider immaterial. (*Kimmel v. Bundy,* 302 Ill. 514.)

Plaintiffs attach importance to the failure of the defendant bank to release the mortgage until demanded by the subsequent purchaser Dees. It is apparent from the testimony that the failure to release the mortgage was mere neglect since the notes themselves had theretofore been surrendered by defendant bank.

If plaintiffs' own testimony is taken as true, the most that can be said is that it shows a mere option to pay the purchase price and receive a conveyance at

sometime in the future should they be able to do so. Such option to repay and receive a conveyance will not convert an absolute deed into a mortgage. (*Council v. Bernard,* 319 Ill. 392.) In *Caraway v. Sly,* 222 Ill. 203, the court sustained a demurrer to a complaint on a similar allegation of fact and said: "There was a mere option to pay at some time in the future if the complainant should be able to do so, and if he should become able it would be optional to pay, or not. Such an agreement would never be barred by lapse of time and there never could be any foreclosure. The right to redeem and the right to foreclose are reciprocal, . . . but the bill shows that there was no debt which could have been enforced against the land by foreclosure, either by Sly in his lifetime or by defendants since his death. An agreement giving the complainant a mere option to pay when he should be able and desire to do so, with an agreement to reconvey upon such a payment, did not constitute a mortgage, and the averments of the bill, if proved, would not entitle the complainant to any relief."

It is unnecessary to determine whether the grantee Dees and subsequent holders of interest in the property are purchasers in good faith for value, without notice. The consideration paid by Dees for the land is unquestioned and the record shows no evidence of relationship between Dees and defendant bank indicating any secret venture or speculation entered into by them against the plaintiffs for the purpose of defrauding the plaintiffs out of their rights in the land.

The chancellor was right in dismissing the bill for want of equity and the judgment is affirmed.

*Affirmed.*